## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| RYAN DANIEL HEATHERLY, | CASE NO. 1:23-CV-02456-BMB |
| Plaintiff, | JUDGE BRIDGET M. BRENNAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. |  |

### INTRODUCTION

Plaintiff Ryan Heatherly challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On December 27, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Dec. 27, 2023). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for further proceedings.

### PROCEDURAL BACKGROUND

Mr. Heatherly filed for SSI in June 2021, alleging a disability onset date of October 1, 2009. (Tr. 183). The claim was denied initially and on reconsideration. (Tr. 63-78). Mr. Heatherly then requested a hearing before an Administrative Law Judge. (Tr. 97). Mr. Heatherly (represented by counsel) and a vocational expert (VE) testified on November 7, 2022. (Tr. 46-61). The ALJ held a supplemental hearing in July 2023 where she declined Mr. Heatherly's request to cross-examine

1

the consultative examiner who evaluated his mental impairment and offered opinions on his

functional limitations. (Tr. 35-45). In August 2023, the ALJ determined Mr. Heatherly was not

disabled. (Tr. 14-34). The Appeals Council denied Mr. Heatherly's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 416.1455 and

416.1481). Mr. Heatherly timely filed this action on December 27, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.     Personal and Vocational Evidence

Mr. Heatherly was 7 years old on the alleged onset date and 20 years old at the

administrative hearing. (*See* Tr. 63). He obtained his high school diploma in 2022. (Tr. 637). He

reported multiple attempts to work without success. (Tr. 405, 657, 678, 763). The Social Security

Administration's new hire records show Mr. Heatherly was hired for ten jobs between July 2020

and March 2022. (Tr. 192-93). In his application, Mr. Heatherly reported working at a grocery

store in January and February 2020, a fast-food restaurant in November 2020 and December 2020,

and at a restaurant as a dishwasher in May 2021. (Tr. 208).

## II.    Relevant Educational and Medical Evidence

Mr. Heatherly obtained his high school diploma on a non-traditional schedule. As a high

school sophomore, Mr. Heatherly received services through home instruction due to "significant

emotional concerns that were triggered by being in the school setting." (Tr. 299). He then received

services at PEP Hopewell, a day treatment center for students with significant behavioral and

mental-health challenges. (*Id.*).[1] In January 2019, he was placed in inpatient psychiatric care for five

---

[1]     Information publicly available at http://pepcleve.org/pep-hopewell-whole-child-highlights (last accessed September 9, 2024).

days. (Tr. 300). At the time, he was demonstrating significant concerns, including delusions triggered by the school setting. (*Id.*).

During his junior year (2019-20), Mr. Heatherly withdrew from North Olmsted Schools and attended Albert Einstein Academy. (Tr. 299). He re-enrolled at North Olmsted to begin his senior year and began taking his courses through the ELC, an online self-paced program that provides instruction, with the goal of graduating in June 2021. (*Id.*). In January 2021, he withdrew from North Olmsted to "pursue a career in music." (*Id.*). By March 2021, he had re-enrolled at North Olmsted and took classes through the ELC. (*Id.*). One ELC teacher offered the following comments:

> Ryan has completed a half credit of Government and a half credit of Psychology for the entire school year. He still has five credits to complete for graduation. Ryan started off the year motivated and was definitely on track to graduate. He certainly is capable of understanding the work. Ryan failed to stay focused and he decided to drop out to pursue a music career. After a couple of months, he decided to re-enroll back into school. Ryan works best with people who work with him on a personal basis, but his behavior is so erratic and unpredictable at times, it is difficult to maintain a relationship with him.

(Tr. 301).

In his early academic career, Mr. Heatherly received special education services because of his poor social-emotional and behavioral functions. (*Id.*). Later, beginning in 2018 and extending to graduation, Mr. Heatherly received special education services due to his attention concerns such as difficulty with concentration and organization. (Tr. 300). His accommodations included using the ELC platform, organizational assistance, due-date reminders, work completion prioritization, clarification of expectations and directions, extended time on tests, and attentive behavior assistance, including cues to focus or redirect attention to tasks. (*Id.*) Even in a self-paced

environment with multiple accommodations, Mr. Heatherly took more than a year after his last re-enrollment to complete his coursework and receive his high school diploma. (Tr. 637).

Mr. Heatherly's medical records indicate an extensive history of mental-health treatment, but the earliest medical records in the Administrative Record before me begin in 2021. On January 28, 2021, Mr. Heatherly attended a telehealth therapy appointment with Brian Spence, APRN, CNP, shortly after discharge from inpatient psychiatric care. (Tr. 378). Mr. Heatherly did not want to discuss his hospitalization and course of treatment or stressors contributing to his hospitalization, but discharge paperwork provided to NP Spence indicated paranoia and delusions, diagnoses of bipolar disorder and cannabis use disorder, and a history of schizophrenia and attention deficit hyperactivity disorder (ADHD). (*Id.*). Mr. Heatherly admitted to a prior psychiatric hospitalization in 2017 or 2018. (*Id.*). Though Mr. Heatherly reported relative psychiatric stability and denied symptoms, NP Spence noted his assessment is "complicated by [Mr. Heatherly's] guardedness"; Mr. Heatherly declined to discuss his hospitalization, and "adamantly declined psychiatry, counseling, case management, alcohol and drug treatment, and primary care." (Tr. 380). NP Spence noted limited insight and moderately impaired judgment and strongly recommended Mr. Heatherly continue receiving Invega Sustenna (paliperidone palmitate), a monthly injectable atypical antipsychotic used to treat mood disorders, including schizophrenia, to prevent decompensation and rehospitalization.[2] (Tr. 378-79). NP Spence's diagnostic impression was psychosis, cannabis use disorder, and a history of ADHD. (Tr. 380). Mr. Heatherly declined

---

[2]     *See Paliperidone Injection*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a615032.html (last accessed September 9, 2024).

medication other than the injection and declined all other mental-health services. (*Id.*). He received the injection on February 8, 2021. (Tr. 377).

On February 18, 2021, Mr. Heatherly attended another telehealth appointment with NP Spence and agreed to attend a psychiatric evaluation. (Tr. 376). He was guarded, cooperative, calm, and pleasant, with a linear and coherent thought process and no abnormal thought content. (*Id.*). NP Spence noted limited insight and moderately impaired judgment. (*Id.*). At the end of the visit, Mr. Heatherly requested a stimulant for attention and concentration. (*Id.*). He also asked NP Spence what bones and organs are under the shoulders; he wondered if this could be a wing. (*Id.*).

On February 26, 2021, Mr. Heatherly presented at another telehealth appointment with NP Spence and underwent a psychiatric evaluation. (Tr. 369). He initially stated he was not interested in discussing negative topics but reported an incident in 2017 when he was hospitalized: he accidentally pulled the "help string" in the bathroom and six or seven police officers pinned him down, chained him naked to the bed, and took pictures of him. (*Id.*). He stated he was then hospitalized at another facility for two weeks and started taking Abilify; he stopped when he became concerned the drug was "turning him female." (*Id.*). NP Spence again noted the assessment was complicated by guardedness and the presentation and symptoms were consistent with his diagnoses. (Tr. 372-73) ("Psychotic disorder could explain attention and concentration deficit."). He again noted limited insight and moderately impaired judgment. (Tr. 372).

On March 26, 2021, Mr. Heatherly had a telehealth appointment with NP Spence and reported he was recently hired at a fast-food restaurant. (Tr. 365). He was engaged, cooperative, calm, and pleasant, and did not display abnormal thought content or thought processes. (Tr. 366-67). He endorsed ADHD symptoms, such as "staring into space" and "daydreaming," and he

requested medication to speed up his schoolwork. (Tr. 365). He denied hallucinations and paranoia but reported waving at the police while carrying cannabis; but when he arrived at his friend's house the cannabis was gone. (*Id.*). NP Spence noted Mr. Heatherly's commentary: "There's something going on with the police department." (*Id.*). Although Mr. Heatherly reported relative psychiatric stability, NP Spence noted he changed topics abruptly on occasion and recalled multiple instances of "authority figures conspiring." (Tr. 367).

On April 22, 2021, Mr. Heatherly attended a telehealth appointment with NP Spence and reported wanting to stop the monthly injections due to arm pain. (Tr. 361). He endorsed doing well and reported "he is getting a second opinion" from another psychiatrist. (*Id.*). Though Mr. Heatherly had not yet been examined for the second opinion, another psychiatrist allegedly told Mr. Heatherly he has post-traumatic stress disorder (PTSD), not schizophrenia. (*Id.*). NP Spence informed Mr. Heatherly to expect decompensation if he declined the injections. (Tr. 363). Mr. Heatherly agreed to continue with injections, but was suspicious and abruptly ended the session. (*Id.*).

At his next telehealth session on April 29, 2021, Mr. Heatherly reported he was not placed on the schedule at work and admitted he had been skipping shifts "here and there." (Tr. 357). He was cooperative but suspicious and had limited insight and moderately impaired judgment. (Tr. 358). Mr. Heatherly reported relative psychiatric stability, but NP Spence noted this was inconsistent with collateral information from medical records, family members, and his reported employment instability. (*Id.*). Mr. Heatherly refused injections but agreed to take an oral version of the medication, though it would likely result in poorer symptom control and increased side effects.

(*Id.*). NP Spence determined it was necessary to see Mr. Heatherly frequently to monitor for non-concordance and decompensation. (Tr. 359).

On May 13, 2021, Mr. Heatherly attended another telehealth session with NP Spence and reported obtaining a new job dishwashing at a bar. (Tr. 352-53). He was cooperative but suspicious and NP Spence suspected Mr. Heatherly was underreporting his symptoms but did not see evidence of decompensation at that time. (Tr. 353-54).

On June 9, 2021, Mr. Heatherly reported to NP Spence that he was terminated from the dishwashing position and currently employed as a "food deliverer," and he was considering moving out of his grandmother's residence to live with his girlfriend. (Tr. 348). NP Spence noted Mr. Heatherly was more guarded and less talkative. (Tr. 349). Mr. Heatherly reported relative psychiatric stability, but NP Spence suspected he was underreporting, especially given his difficulty with maintaining employment without a clear explanation. (*Id.*).

On July 7, 2021, Mr. Heatherly reported to NP Spence that he stopped taking Invega Sustenna, was considering moving in with a new girlfriend, denied depression and anxiety, endorsed fair attention and concentration, and reported continued employment as a food deliverer. (Tr. 502). NP Spence noted Mr. Heatherly was guarded and cooperative but withdrawn, with limited insight and moderately impaired judgment. (Tr. 503). NP Spence suspected Mr. Heatherly was minimizing his condition and felt his prognosis was limited by insight and a disinterest in clinically appropriate medication. (Tr. 504).

On October 14, 2021, Mr. Heatherly met with his primary doctor Kenneth Kall, D.O., for follow-up after inpatient psychiatric care.[3] (Tr. 400). Mr. Heatherly reported that he stopped taking Invega Sustenna because he did not like injections but was restarted on the oral form of the medication while in the emergency department three days prior. (Tr. 401). Dr. Kall noted some anger, poor insight, and poor judgment. (Tr. 403). He prescribed Vraylar, a mood stabilizer. (Tr. 400). Mr. Heatherly's grandmother attended the appointment and expressed feeling overwhelmed because Mr. Heatherly recently lost a phone, lost his car, and has been fighting with friends. (Tr. 401).

On October 29, 2021, Mr. Heatherly was admitted for inpatient psychiatric care for a third time. (Tr. 388). That day, his grandmother called the police and asked them to transport him to the emergency room for delusional and increasingly bizarre behavior and decompensation. (Tr. 569). On initial assessment, he was very disorganized and appeared to be internally stimulated and highly distractible. (*Id.*). When Abu Sayed, M.D., first met with Mr. Heatherly, he was talking to imaginary people. (*Id.*). He went off on a tangent about attending Albert Einstein Academy and that an attorney was taking him there. (*Id.*). Mr. Heatherly either did not respond to questions or his answers were irrelevant. (*Id.*). On mental status examination, Mr. Heatherly was cooperative but very confused and disorganized, with pressured and tangential speech that was, at times, irrelevant and increased psychomotor activity. (Tr. 570). Dr. Syed planned to admit Mr. Heatherly and restart his medications. (*Id.*).

---

[3]     The administrative transcript does not contain medical records from Mr. Heatherly's second inpatient hospitalization of 2021.

8

By October 31, 2021, Mr. Heatherly was still "quite disorganized" but was settling down. (Tr. 606). On November 1, he was "not as disorganized" but appeared preoccupied. (Tr. 607). Dr. Syed continued risperidone and added Trazodone. (*Id.*). On November 2, Mr. Heatherly was making steady progress but was still impulsive, had limited insight, his speech frequently became disorganized, and he was somewhat grandiose, unrealistic, and dramatic. (Tr. 612). Dr. Syed added Depakote to his regimen.[4] (*Id.*). On November 3, Dr. Syed noted Mr. Heatherly was responding well to the medications but acted in a bizarre, childish manner, sought attention, and was labile. (Tr. 613). On November 4, Dr. Syed described Mr. Heatherly as "redirectable" and "calm." (Tr. 614). By November 5, 2021, Mr. Heatherly was substantially improved and stable enough to be discharged. (Tr. 571).

On November 16, 2021, Mr. Heatherly followed up with Dr. Kall and expressed concern that he may have bipolar disorder as well. (Tr. 405). He wanted to continue taking medications he received during his inpatient hospitalization (divalproex and risperidone) and reported being open to injections again.[5] (*Id.*). Mr. Heatherly endorsed trying to work at nine different jobs in the past year. (*Id.*). Dr. Kall noted some pressured speech and a mildly tangential thought process. (Tr. 407). Dr. Kall spoke separately with Mr. Heatherly's grandmother, who reported Mr. Heatherly was acting odd and changed his sleep habits and activities. (Tr. 405).

---

[4]    Depakote is a brand name for valproic acid, which is used to treat mania in people with bipolar disorder. *See Valporic Acid*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682412.html (last accessed September 9, 2024).

[5]    Divalproex sodium is another name for valproic acid. *See id.* (last accessed September 9, 2024). Risperidone is an antipsychotic used to treat schizophrenia and mania. *Risperidone*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a694015.html (last accessed September 9, 2024.

That same day, Mr. Heatherly met with Bianca Stallings, APRN, CNP, who was filling in for NP Spence. (Tr. 481). Mr. Heatherly reported his medications help and he does not need to talk to anyone after this appointment because he has good control over his symptoms and did not like treatment. (Tr. 482). He denied paranoia but said he cut back on videogames because "AI is trying to take over." (Tr. 483). When she asked Mr. Heatherly about drug or alcohol use, he responded, "If you really want to know my addiction, I'm not going to tell you." (*Id.*). NP Stallings convinced Mr. Heatherly to follow up for one more visit. (Tr. 482).

Mr. Heatherly met with NP Spence again on December 17, 2021. (Tr. 472). There, he endorsed working part-time at a pizzeria. (*Id.*). When NP Spence tried to review Mr. Heatherly's recent hospitalization, Mr. Heatherly claimed a nicotine addiction was the reason for his admission. (*Id.*). He felt the medication was helpful. (*Id.*). On examination, he was cooperative and engaged, displayed a tangential thought process, and had limited insight and moderately impaired judgment. (Tr. 474). NP Spence noted Mr. Heatherly's presentation was consistent with mild thought disorganization, but he appeared significantly more insightful and treatment-motivated than in the past. (*Id.*).

On January 8, 2022, at a telehealth session with NP Spence, Mr. Heatherly described medication compliance. (Tr. 465). He stopped delivering food when his car broke down. (*Id.*). NP Spence noted Mr. Heatherly displayed a circumstantial thought process, limited insight, and moderately impaired judgment. (Tr. 467). NP Spence continued prescriptions for divalproex and risperidone. (*Id.*).

Mr. Heatherly attended another telehealth session with NP Spence on January 28, 2022, and reported working at McDonalds but was unable to maintain the job due to having panic

attacks when feeling overwhelmed. (Tr. 455). When he had a panic attack, he hid in the restaurant's bathroom. (*Id.*). Mr. Heatherly was cooperative and engaged, with a circumstantial thought process, limited insight, and moderately impaired judgment. (Tr. 457).

On February 23, 2022, Mr. Heatherly endorsed having a new girlfriend, helping his grandmother around the house, watching television, playing videogames, and going for drives. (Tr. 448). He was searching for a job at the time. (*Id.*).

On April 29, 2022, Mr. Heatherly met with NP Spence and reported relative psychiatric stability. (Tr. 657). He then recalled that, around age 15 or 16, he was expelled because a 42-year-old female attorney "for special needs kids" took him to Japan where they engaged in a sexual relationship. (*Id.*). She purportedly fed him Vyvanse. (*Id.*). She threatened to kick Mr. Heatherly out when he stole $10, so he threatened to disclose the affair. (*Id.*). She blocked Mr. Heatherly on the phone and social media, but he knows she still has sexual relationships with her student clients. (*Id.*). When asked about his mood, Mr. Heatherly stated he was "just doing things with [his] friends" but when asked if he was depressed, Mr. Heatherly said he feels depressed and stays "in the basement doing nothing." (Tr. 658). NP Pence noted Mr. Heatherly was engaged and cooperative, his thought process was disjointed, and he had poor insight and fair judgment. (Tr. 659) ("More engaged with provider. Disclosed details about what seems to be a static delusion. Frequently preoccupied with delusion but overall appears to be improving.").

At a telehealth appointment with NP Spence in May 2022, Mr. Heatherly reported graduating high school and doing okay. (Tr. 646-47). He was somatically preoccupied at the beginning of the visit, which NP Spence attributed to suspected residual psychosis. (Tr. 648).

In June 2022, Mr. Heatherly told NP Spence he was depressed most of the time, felt tired, and had fair attention and concentration. (Tr. 638). He denied psychotic symptoms but admitted to pulling out his hair three to four times a day. (*Id.*). NP Spence continued his medications. (Tr. 639).

Mr. Heatherly met with NP Spence again in October 2022, where he endorsed medication compliance. (Tr. 828). He reported trying to work at Panera but quitting after orientation. (*Id.*). He again recalled his affair with a female attorney in Japan. (*Id.*). He was open and cooperative, euthymic and coherent, but had a disjointed thought process, severely impaired insight, and moderately impaired judgment. (Tr. 830). NP Spence continued his medications. (*Id.*).

In December 2022, Mr. Heatherly reported forgetting to take his medication about once a week. (Tr. 819). He also reported a decrease in appetite, low motivation and energy, fair attention and concentration, depression and difficulty expressing emotions, and anxiety with flashbacks to his prior hospitalizations. (*Id.*). He was open and cooperative, euthymic and coherent, but had a disjointed thought process and moderately impaired insight and judgment. (Tr. 820-21).

In January 2023, Mr. Heatherly reported feeling better and could enjoy activities like playing video games. (Tr. 805). He denied psychosis and mania but claimed to feel unsafe at times "because fast food restaurants know he knows recipes after working there." (*Id.*). NP Spence noted Mr. Heatherly was more pressured and disjointed than prior visits but he remained appropriate for outpatient treatment. (Tr. 807). NP Spence restarted Mr. Heatherly's Invega Sustenna injections in lieu of oral medication and continued divalproex and risperidone. (*Id.*).

On January 13, 2023, Mr. Heatherly presented with his grandmother to receive his Invega Sustenna injection. (Tr. 794). There, he complained that someone stole his wallet, keys, and cell

phone from his car. (*Id.*). His grandmother informed the nurse that Mr. Heatherly just misplaced his things. (*Id.*). The nurse noted Mr. Heatherly was restless, circumstantial, tangential, and experiencing possible persecutory delusions. (*Id.*).

On February 14, 2023, Mr. Heatherly attended an initial mental-health assessment where mental status examination revealed fleeting eye contact, distractible and tangential thought process, perceptual delusions, distracted attention, and impaired judgment. (Tr. 764-65).

On March 9, 2023, NP Spence noted Mr. Heatherly was cooperative and engaged, goal-directed, euthymic, and calm, with moderately impaired insight and mildly impaired judgment. (Tr. 743-44).

At his most recent appointment with NP Spence in June 2023, Mr. Heatherly reported relative psychiatric stability and was cooperative, engaged, euthymic, agreeable, and calm, and displayed moderately impaired insight. (Tr. 690-91).

## III.    Medical Opinions

On July 30, 2021, a state agency psychological consultant reviewed Mr. Heatherly's records and assessed his mental residual functional capacity (RFC). (Tr. 63-69). The consultant determined Mr. Heatherly was moderately limited in the ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; and (7) respond appropriately to changes in the work setting. (Tr. 67-68). The consultant opined Mr. Heatherly can complete

one- to four-step work-related tasks, is limited to work tasks that do not involve prolonged periods of attention and concentration, and can handle occasional changes in work-related tasks. (*Id.*). Additionally, the consultant determined Mr. Heatherly should be limited to work-related tasks in a non-public environment that do not require negotiating with, instructing, persuading, or directing the work of others. (Tr. 68). On reconsideration, another state agency psychological consultant reviewed updated records and offered the same opinions. (Tr. 75-76).

On June 24, 2022, NP Spence completed a mental impairment questionnaire on Mr. Heatherly's behalf. (Tr. 567-68). Based on clinical findings of psychosis, paranoia, thought disorganization, delusions, depression, and anxiety, NP Spence determined Mr. Heatherly was unable to meet competitive standards or had no useful ability to perform work-related tasks. (*Id.*). He opined Mr. Heatherly would always be off-task and absent from work. (Tr. 568).

On February 13, 2023, Charles Misja, Ph.D., met with Mr. Heatherly for a consultative examination. (Tr. 678-82). During the hour-long interview, Dr. Misja noted the following relevant details:

> The claimant has been hospitalized several times at St. Vincent, St. John's, Lutheran, Lakewood and Fairview Hospital and the most recent was in December of 2021 and he was there for two weeks. He reported that he's been diagnosed with schizophrenia, depression, anxiety, PTSD and OCD. He stated he is easily angered and oppositional to direction. He stated he was jumped while in the hospital by seven police officers and was strapped down and stuck for a week. He reported seeing "shadows" and people abruptly disappearing from view. He reported that his cat "teleported." He sees a psychologist at The Center on a monthly basis.
>
> * * *
>
> The longest the claimant has ever had a single job was McDonald's for eight months and he was fired "because of covid." He worked for a demolition crew with his father, fast food, and stated he was fired from all [of] them. He stated he was fired because he couldn't pay attention and has daydreams that put him into a trance. He stated

14

he had difficulty learning what to do and the complexity of multi-tasking [was] difficult. He stated he got migraines from the pace of work.

(Tr. 679-80).

Dr. Misja described Mr. Heatherly as clean, cordial, and cooperative, but intense throughout the interview, his speech was pressured at times, and he demonstrated loose associations. (Tr. 680). He was depressed and mildly labile with a flat affect. (*Id.*). Otherwise, Dr. Misja found no evidence of hallucinations, delusions, grandiosity, preoccupations, suspiciousness, aggression, hostility, paranoid ideation, or unusual thought content. (Tr. 681). After testing sensorium and cognitive function, Dr. Misja determined Mr. Heatherly functions in the average range of intelligence. (*Id.*). Summarizing the interview, Dr. Misja noted Mr. Heatherly's schizophrenic symptoms were reasonably well-controlled by medication, but he voiced persecutory themes (his mother tried to kill him, family caretakers did not provide for him, police attacked him while he was hospitalized, and supervisors fired him because he disclosed too many details about his personal life) and displayed poor insight and judgment. (*Id.*). Dr. Misja also noted Mr. Heatherly had difficulty focusing during the interview and required frequent redirection. (Tr. 681-82). Based on the clinical interview and 25 pages of medical records, Dr. Misja opined Mr. Heatherly "should be able to understand, remember, and implement ordinary instructions," will likely have "intermediate" problems in maintaining attention, concentration, persistence, and pace to perform simple and multi-step tasks; will likely have "intermediate to severe" problems responding appropriately to supervision and coworkers; and will likely have "intermediate to severe" problems in responding appropriately to work pressures. (Tr. 682).

15

IV.     **Administrative Hearing**

At the administrative hearing, counsel for Mr. Heatherly described a lifelong history of mental issues, diagnoses for ADHD and schizophrenia, and multiple inpatient hospitalizations. (Tr. 51). Mr. Heatherly testified to 14 failed attempts at work and some of the circumstances leading to his terminations including oversharing personal details with his supervisor, having a stress-induced panic attack at Giant Eagle and calling an ambulance, having a breakdown after his supervisor became angry with him, and having PTSD flashbacks that affect his mood. (Tr. 53-54).

When asked if he struggles to focus and concentrate, Mr. Heatherly replied yes and explained that his grandma broke her hip after she tripped over a stray cat he brought home, and it was his fault. (Tr. 54-55). When asked how that relates to the present question about his struggles to focus and concentrate, Mr. Heatherly indicated there is so much on his mind that he "just skipped over that question." (Tr. 55).

The VE opined that a person of Mr. Heatherly's age and education, with the functional limitations described in the ALJ's RFC determination, could perform work as a laundry worker, hospital cleaner, and hand packager. (Tr. 58). The VE also opined employers tolerate no more than 10% off-task time and no more than one absence per month. (Tr. 59).

After testimony concluded, the ALJ ordered Mr. Heatherly to attend a consultative examination. (Tr. 59-60).

V.      **Other Relevant Evidence**

On July 8, 2021, Mr. Heatherly completed an Adult Function Report describing how his mental health conditions limit his activities. (Tr. 226-33). He can do laundry, play videogames, do schoolwork, shop for essential living items and order takeout, and handle his finances. (Tr. 228-

16

29). He does not handle stress or changes in routine well. (Tr. 230). He struggles to concentrate and often experiences PTSD flashbacks to major events. (Tr. 232). He can pay attention for "a very long time" and follow written instructions but cannot follow spoken instructions well. (*Id.*).

On October 3, 2022, Mr. Heatherly's grandmother Ms. Weiskettel completed a Third-Party Adult Function Report. (Tr. 274-81). Ms. Weiskettel indicated Mr. Heatherly has a very short attention span, delusions, confused thoughts, and fatigue. (Tr. 274). He is socially withdrawn, spends most of his time in the basement, and has conversations with the television. (Tr. 274-75). Mr. Heatherly can prepare simple meals in the microwave and might be able to follow a recipe if his grandmother helps him. (Tr. 276, 279). He puts away dishes, does laundry, and takes the garbage cans to the street. (*Id.*). According to Ms. Weiskettel, Mr. Heatherly requires repeat directions and must be told to do his chores several times before he does them. (Tr. 277). He does not go out alone because he has PTSD. (*Id.*). Ms. Weiskettel takes Mr. Heatherly with her to go shopping. (*Id.*). He does not like being around other people, but he will get lunch with his dad weekly and regularly swims at the recreation center. (*Id.*). Ms. Weiskettel indicated Mr. Heatherly's conditions affect his memory and concentration and his abilities to complete tasks, follow instructions, and get along with others. (Tr. 279). He does not handle stress or changes in routine well, has difficulty following spoken instructions, and does not get along well with authority figures. (Tr. 280). Ms. Weiskettel recalled Mr. Heatherly has been fired for arguing with coworkers and supervisors. (*Id.*). In the past year, Mr. Heatherly worked at Kenny Kings, Boston Market, Caesar's Pizza, Andy's Car Wash, Giant Eagle, Dunkin Donuts, McDonald's, and the Salvation Army, but did not last long at any job. (Tr. 281). On one occasion, Mr. Heatherly locked himself

in the basement and took apart the hot-water tank and furnace for no reason; this prompted Ms. Weiskettel to call the police to take him to the hospital. (*Id.*).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 & 416.920— to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other

work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Heatherly had not engaged in substantial gainful activity since April 28, 2021, the date of his application. (Tr. 20). At Step Two, the ALJ identified the following severe impairments: schizoaffective disorder, ADHD, and PTSD. (*Id.*). At Step Three, the ALJ found Mr. Heatherly did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (*Id.*).

The ALJ determined Mr. Heatherly's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can understand, remember, and apply information to complete simple instructions in a routine work environment. He can adapt to occasional changes in routine work tasks. The claimant can interact with others to perform work tasks such as asking questions, gathering information, clarifying instructions, serving and pointing, or directing where items may be placed, but no work directing the work of others or conflict resolution. The claimant should avoid work that requires direct provision of services to the general public but incidental contact is acceptable (for example, a dishwasher position).

(Tr. 22).

At Step Four, the ALJ found Mr. Heatherly does not have past relevant work. (Tr. 27). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Mr. Heatherly can perform. (Tr. 28). Therefore, the ALJ determined Mr. Heatherly was not disabled. (*Id.*).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.,* 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference.

20

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Mr. Heatherly brings two issues for review. First, he claims the ALJ did not properly evaluate the medical opinions in accordance with the regulations. (ECF #8 at PageID 870) ("the ALJ failed to consider the totality of the medical evidence which, contrary to her erroneous conclusion, supported and was consistent with the medical evidence in this matter"). Second, he asserts the ALJ deprived him of his due process rights when she denied his request for more information from Dr. Misja. (*Id.* at PageID 878).

I.      **Medical Opinion Evaluation**

Because Mr. Heatherly filed his application after March 27, 2017, medical opinions are

evaluated under the revised regulations found in 20 C.F.R. § 416.1920c. Under the revised

regulations, the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and

all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b).

The revised regulations eliminate the hierarchy of medical-source opinions that previously

gave preference to treating-source opinions. Now, the ALJ need not defer to or give any specific

evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not

required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102,

2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a

medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship

with the claimant, including the length of treatment relationship, the frequency of examinations,

purpose of the treatment relationship, and the examining relationship; (4) specialization; and

(5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R.

§ 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in

the record, grounded in the two "most important factors" of supportability and consistency. *Id.* at

§ 416.920c(a). With respect to supportability, the more relevant the objective medical evidence

and supporting explanations presented by a medical source are to support his medical opinion, the

more persuasive the medical opinion will be. *Id.* at § 416.920c(c)(1). Regarding consistency, the

more consistent a medical opinion is with the evidence from other medical and nonmedical

sources, the more persuasive the medical opinion will be. *Id.* at § 416.920c(c)(2). An ALJ must

explain how she considered the factors of supportability and consistency, and "may, but [is] not

22

required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See id.* at § 416.920c(b)(2)-(3).

"The regulations are clear and imperative in defining the mode of analysis. All medical sources are to be considered, and a rationale articulating how the ALJ applied the factors specified in the regulations must be stated for each source." *Hardy v. Comm'r of Soc. Sec.,* 554 F.Supp.3d 900, 909 (E.D. Mich. Aug. 13, 2021) (citations omitted). The reviewing court is not to comb the record and imagine manifold ways in which the factors could have been applied to the evidence that was presented. *Id.* "The [ALJ] has the obligation in the first instance to show his or her work, *i.e.,* to explain in detail how the factors were actually applied in each case, to each medical source." *Id.*

### A.    NP Spence

Mr. Heatherly asserts the ALJ erred because she focused on alleged gaps in his treatment rather than on the treatment notes themselves. (ECF #8 at PageID 874). The ALJ evaluated NP Spence's opinion as follows:

> Brian Spence, APRN the claimant's primary mental health care provider, opined that the claimant had "no useful ability" or was "unable to meet competitive standards" to perform any work-related mental activities set forth on a *Mental Impairment Questionnaire* form, including carrying out very short and simple instructions, remembering locations and work-like procedures, and responding appropriately to changes in the work setting. This opinion is not persuasive because it is inconsistent with his own treatment notes which indicate greater cognition, stress tolerance, and ability to manage routine changes, both in terms of APRN Spence's mental observations of the claimant and the claimant's self-reported symptoms and daily activities during the period of alleged disability.

(Tr. 27) (underline and italics in original) (citations omitted). Standing alone, this explanation does not satisfy the ALJ's articulation requirement because the ALJ does not refer to evidence supporting her conclusion.

Looking elsewhere in the decision, the ALJ emphasized mental status examinations showing Mr. Heatherly was calm, pleasant and cooperative; had normal thought content without perceptual distortions; and had "no acute limits in cognition, memory, or hygiene." (Tr. 25). The ALJ also noted Mr. Heatherly's activities, including going on dates, socializing with friends, focusing on school and obtaining his diploma, dealing with situation stressors such as his grandmother breaking her hip, watching his girlfriend's child, driving, getting into an accident and fixing his car, and playing video games. (*Id.*). These records could support the ALJ's determination that NP Spence's treatment notes indicate "greater cognition, stress tolerance, and ability to manage routine changes." (*See* Tr. 27). But the medical records and the ALJ's own summary of the medical evidence reflects contradictory information as well. For example, Mr. Heatherly was hospitalized for inpatient psychiatric care three times in 2021. (Tr. 378, 388, 400). In January 2022, Mr. Heatherly described feeling "terrible" and "beyond sad," having daily depression, and feeling like people want to hurt him. (Tr. 465-66). In May 2022, NP Spence observed somatic preoccupation and suspected residual psychosis. (Tr. 648). In June 2022, Mr. Heatherly described pulling out his hair several times a day and feeling depressed all the time. (Tr. 638). NP Spence suspected Mr. Heatherly was underreporting his condition. (Tr. 349). At his appointments, Mr. Heatherly often discussed finding new jobs and quitting or being fired after a short period of time due to his symptoms. (Tr. 348, 352, 357, 365, 448, 455, 465, 828).

The ALJ erred, but my determination is not based on Mr. Heatherly's argument that the ALJ focused more on alleged gaps in treatment than the treatment notes themselves. I determine that although the ALJ appears to have extensively summarized the record, the ALJ's summary includes supportive and contradictory information and fails to explain the factual basis for her

conclusory statement that Mr. Heatherly had "greater cognition, stress tolerance, and ability to manage changes in routine" than reflected in NP Spence's opinion. Because the ALJ did not sufficiently explain her conclusion, the ALJ did not properly evaluate NP Spence's opinion and it is not supported by substantial evidence. *See Hardy*, 554 F.Supp.3d at 909 (explaining that the ALJ must "show his or her work, *i.e.*, to explain in detail *how the factors actually were applied* in each case, to each medical source") (emphasis in original). This Court cannot independently supply such an explanation. *See id.* ("It is not the role of a reviewing court to comb through the record and imagine manifold ways in which the factors could have been applied to the evidence that was presented.").

The substantial-evidence test is a lenient standard and consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). It bears repeating that a substantiality-of-evidence evaluation does not permit a selective reading of the record; it must be based on the record as a whole and must account for whatever in the record fairly detracts from its weight. *Brooks,* 531 F.App'x at 641. Remand is necessary to allow appropriate consideration of the evidence and a proper application of the regulations and to reassess the RFC.[6]

---

[6] In some instances, the failure to apply the rules properly can be harmless error, such as where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," or where the Commissioner "has met the goal of . . . the procedural safeguard of reasons." *Wilson*, 378 F.3d at 547. But the Commissioner makes no harmless-error argument, and therefore I consider any such argument waived. *See Jordan v. Comm'r of Soc. Sec.*, No. 2:14-cv-2053, 2015 WL 8027396, at *5 (S.D. Ohio Dec. 7, 2015); *Jones v. Comm'r of Soc. Sec.*, 5:13-cv-02087, 2014 WL 4715727, at *8 n.18 (N.D. Ohio Sept. 22, 2014) ("The Commissioner's harmless error argument is cursory and vague. Thus, the Commissioner has arguably waived a harmless error argument").

B.      Dr. Misja

The ALJ analyzed Dr. Misja's opinions as follows:

In February 2023, Charles Misja, Ph.D., performed a consultative psychological examination of the claimant at the undersigned's request. The claimant told Dr. Misja that the longest he ever held a single job was at a fast-food restaurant for eight months, after which he was fired "because of covid." The claimant reported he was fired from all subsequent jobs that he attempted because he could not pay attention, had daydreams that put him in a trance, and had difficulty with multitasking. The claimant stated he followed all of his supervisors' directions but, "When I give them too much information about my personal life, I get fired." Asked about daily activities, the claimant stated he had a driver's license and drove his own vehicle to get around, though Dr. Misja noted that the claimant's grandmother drove him to the appointment. The claimant said he had few friends and little social life outside of his girlfriend. He reported managing his own financial affairs, showering and changing clothes daily, washing dishes, doing laundry, and taking his girlfriend's son to therapy.

Per Dr. Misja's exam report, the claimant exhibited "no evidence of visual or auditory hallucinations, delusions, or ideas of reference . . . There were no indications of bizarre or unusual thought content typically associated with a thought disturbance." The claimant presented with adequate grooming and appropriate dress for weather. The claimant was "intense throughout the interview with no light moments or casual conversation," but was also cordial and cooperative. The claimant's speech was pressured at times and he demonstrated loose associations, but his speech was easy to understand. Dr. Misja observed flat affect and depressed, mildly labile mood in the claimant. The claimant rated his anxiety as 10/10 "because I'm a defensive driver, especially when the moon's out, it gets crazy." On cognitive testing, the claimant demonstrated intact recent and remote memory and had sufficient concentration of perform serial 7s and recalling digits forwards and backwards. The claimant was able to interpret proverbs, identify similarities, and correctly define "plagiarize," indicating intact abstract thinking and fund of knowledge.

Dr. Misja opined that the claimant "should be referred to the BVR or similar organization as employment in a conventional work setting seems unlikely." He also opined that the claimant could understand, remember, and implement ordinary instructions; would have intermediate problems with multi-step tasks; and would have intermediate to severe problems responding appropriately to supervision and coworkers in a work setting because his schizophrenia would "likely result in him misinterpreting actions and motives of others." This opinion is not fully persuasive for several reasons. First, he used vague imprecise terms and did not provide a quantitative assessment of the claimant's abilities or limitations. For example, in the area of concentration, persistence, and pace, Dr. Misja stated what the claimant told

26

him and for his opinion he stated: "Problems in this area are likely to be in the
intermediate range." In addressing the claimant's ability to respond to supervision
and work pressure, he said "Problems in this area are likely to be in the intermediate
to severe range." Second, he did not explain or support his opinion by referencing
findings from his interview. Third, his opinion that the claimant experiences "severe"
problems when responding to supervisors and work pressures appears inconsistent
with findings on functioning tests of memory, concentration, abstract thinking;
cooperative behavior; and self-described daily activities. They are also inconsistent
with Spence's mental status reports, which indicate similarly stable findings for most
of 2022-2023. Moreover, his opinion regarding employability is not within his
expertise. Instead, a vocational rehabilitation counselor is more properly trained to
assess employability.

(Tr. 26-27) (cleaned up, citations omitted).

First, the ALJ found Dr. Misja's opinions were cloaked in vague, imprecise terminology
("likely to be," "intermediate range") that does not sufficiently establish the degree of limitation
the claimant has to perform a task. (Tr. 26). According to case law within the Sixth Circuit, such
equivocality is a proper rationale for finding an opinion less persuasive because vague and
imprecise language obscures the degree of a claimant's limitations. *See Quisenberry v. Comm'r of Soc.
Sec.,* 757 F.App'x 422, 431 (6th Cir. 2018) (finding no reversible error when the ALJ treated an
opinion as vague based on failure to propose specific limitations); *Caldwell v. Comm'r of Soc. Sec.,*
No. 3:19-cv-1909, 2020 WL 7684877, at *12 (N.D. Ohio Aug. 17, 2020) (determining it was
reasonable for an ALJ to find a restriction offered with the word "may" did not represent the most
that the claimant could do), *report and recommendation adopted,* 2020 WL 7090025 (N.D. Ohio Dec.
4, 2020); *Wilson v. Colvin,* No. 2:15-CV-13409, 2017 WL 370785, at *3-4 (E.D. Mich. Jan. 23,
2017) (upholding ALJ's determination that vague and imprecise language in an opinion regarding
the degree of a claimant's capability gave the opinion less probative value), *report and
recommendation adopted,* 2017 WL 710650 (E.D. Mich. Feb. 23, 2017). Because an RFC is "the

most [a claimant] can still do despite [his] limitations," 20 C.F.R. § 416.945, a medical opinion without properly defined limitations is of diminished probative value.

But, according to Mr. Heatherly, the ALJ "cannot argue that Dr. Misja failed to provide a quantitative assessment when she found that such an assessment was unnecessary." (ECF #8 at PageID 875). Mr. Heatherly does not cite any case law to support this assertion. To the extent he argues the ALJ was required to recontact Dr. Misja for clarification, that argument fails because, under the regulations, the agency will recontact a consultative examiner for clarification when the examiner's report is "inadequate or incomplete." 20 C.F.R. § 416.919p(b). The regulations further provide a consultative examiner's report is not rendered "incomplete" by the absence of a medical opinion. *See id.* § 416.919n(c).

The ALJ's second rationale for discounting Dr. Misja's opinion—that he did not explain or support his opinion by referencing findings from his interview—is, in this context, not supported by substantial evidence for the obvious fact that Dr. Misja's examination report contained a summary of the interview, emphasized key statements and findings, and provided opinions—albeit in vague and imprecise language—that were clearly informed by the evidence Dr. Misja gathered and summarized. For instance, Dr. Misja determined Mr. Heatherly would likely have intermediate problems with maintaining attention, concentration, persistence, and pace because Mr. Heatherly *reported* his attention issues and Dr. Misja *observed* his difficulty maintaining focus and required *frequent redirection* during the interview. (*See* Tr. 682). In reference to Mr. Heatherly's abilities and limitations in responding appropriately to work pressures, Dr. Misja noted the significant number of jobs he attempted and Mr. Heatherly's reported reasons for his subsequent termination from those positions. (*Id.*). Because Dr. Misja expressly referred to his findings from the interview in

support of his opinions, the ALJ's erroneous conclusion to the contrary is not supported by substantial evidence.

The ALJ's third rationale for discounting Dr. Misja's opinion is also not supported by substantial evidence. According to the ALJ, Dr. Misja's finding that Mr. Heatherly may experience severe problems when responding to supervisors and work pressures "appears inconsistent with findings on functioning tests of memory, concentration, abstract thinking; cooperative behavior; and self-described daily activities." (Tr. 26-27). But many of the instances the ALJ relied on do not appear to be inconsistent with Dr. Misja's findings.

First, the mental function testing consisted of the following:

The claimant was given three everyday words to remember and after an interval of about five minutes he was able to recall all three. He did serial 7s and digits forward to five and backwards to three. He didn't know the continent on which Brazil is located but did know why people should study history. When asked to interpret the proverb "Fall seven times, stand up eight" the claimant responded "You can keep falling but get up and try again." He correctly identified how an eye and ear are alike and correctly defined "plagiarize."

(Tr. 681). And though Mr. Heatherly adequately performed for the short period of time it took to complete those questions, Dr. Misja still observed Mr. Heatherly struggle to remain focused during the hour-long interview and required frequent redirection. (Tr. 682). The ALJ has not explained, and it is not evident, how positive results on short-duration mental function testing translates to the ability to function for eight hours in a work setting. Thus, the results of brief mental function testing are not inconsistent with Dr. Misja's opinion.

Second, the ALJ's relies on the highly generalized finding of "cooperative behavior" which is equally unpersuasive as an inconsistency. Mr. Heatherly's cooperative behavior during his medical appointments is not inconsistent with Dr. Misja's opinion because even when Mr.

29

Heatherly was actively psychotic, highly distractible, and reacting to internal stimuli, he was described as "cooperative." (Tr. 569-70). Thus, Mr. Heatherly's limitations are unrelated to his cooperativeness.

Finally, the ALJ found Mr. Heatherly's self-reported activities inconsistent with Dr. Misja's opinion. Elsewhere in the decision, the ALJ identified Mr. Heatherly's activities, including going on dates, socializing with friends, focusing on school and obtaining his diploma, watching his girlfriend's child, driving, and playing video games. Although an ALJ may properly consider a claimant's household and social activities when evaluating a claimant's assertion of pain or ailments, the ALJ must establish that the claimant could have performed such activities on a "sustained basis" when assessing a claimant's mental impairments. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013). The ALJ made no such showing here. Thus, the "inconsistencies" identified by the ALJ are not supported by substantial evidence. The ALJ's errors in evaluating Dr. Misja's opinion require remand for additional consideration.

### C.  State agency psychological consultants' opinions

The ALJ evaluated the state agency consultants' opinions as follows:

At the initial and reconsideration levels, State agency psychological consultants opined that the claimant was (1) capable of completing 1-4 step work-related tasks, was limited to work-related tasks that did not involve prolonged periods of attention and concentration, and was limited to performing tasks in a non-public environment that do not require negotiating with, instructing, persuading, or directing the work of others. These opinions are not fully persuasive because they used vague, imprecise terminology that was not defined by them nor used by the DOT to express work tasks, environments or skills. Hence, those words and phrases were rejected by the undersigned. For example: "1-4 step work related tasks" "prolonged periods of attention and concentration" and "minor." Instead, the undersigned addressed the claimant's memory, concentration and adaptability limits by restricting him to simple instructions, routine work tasks, and interacting with others that is at the most basic

level and which does not require greater social skills or interaction skills for performing work.

(Tr. 27).

Here, the ALJ did not evaluate the consistency or supportability of the State agency consultants' opinions, as required by the pertinent regulations. *See* 20 C.F.R. § 416.920c(b). Rather, the ALJ accepted the opined limitations without question or analysis and converted those limitations into terminology consistent with the regulations. Thus, the ALJ failed to apply the regulations appropriately and her conclusions are not supported by substantial evidence.

In sum, for the reasons detailed above, the ALJ erred in the evaluation of all the medical opinions in this matter, necessitating remand.

## II. The ALJ did not violate Mr. Heatherly's due process right to a full and fair hearing.

Mr. Heatherly next argues he was "denied due process as he was not given a 'meaningful opportunity to present [his] case' when the ALJ failed to request further information from Dr. Misja." (ECF #8 at PageID 878). I do not find this correct.

At the first hearing, the ALJ ordered a consultative evaluation to assess limitations posed by Mr. Heatherly's mental-health symptoms. (Tr. 59-60). After Mr. Heatherly attended the consultative evaluation and Dr. Misja submitted his report, the ALJ entered the additional evidence into the record and sent Mr. Heatherly's counsel a proffer letter. (Tr. 287-88). The letter informed counsel that he could, among other things, submit written questions for the author of the new evidence or request a supplemental hearing and the opportunity to question the author of the new evidence. (Tr. 287). Counsel requested the opportunity to question Dr. Misja at a supplemental hearing or have Dr. Misja complete a psychiatric review technique form (PRTF) to

place his opinions in terms consistent with the regulations, *i.e.,* "mild," "moderate," "marked," or

"extreme" limitations. (Tr. 43).

> In the written decision, the ALJ declined counsel's requests, stating:
>
> In his original request for supplemental hearing, attorney, Mr. Liner requested the opportunity to question Dr. Misja, who authored [the consultative evaluation]. At the hearing, Mr. Liner requested that the undersigned have Dr. Misja complete a psychiatric review technique form and return it. The undersigned did not rule on this issue on the record but stated this issue would be considered. The undersigned asked Mr. Liner if he wished to question the claimant or the vocational expert, and Mr. Liner declined.
>
> After careful consideration, the undersigned DENIES Mr. Liner's request to have Dr. Misja complete a PRTF. The undersigned has made reasonable efforts to obtain evidence by ordering a consultative exam after the State agency did not, admitting the exam report to the record, and scheduling a supplemental hearing to give Mr. Liner the opportunity to obtain additional testimony from the claimant and the vocational expert witness. To have Dr. Misja complete an additional form is unnecessary. It is the undersigned's responsibility to analyze, interpret, and weigh the evidence and resolve any apparent or perceived conflicts. The undersigned interpreted Dr. Misja's opinions and considered it in the context of his interview findings. After considering this information in conjunction with other evidence of record and State agency consultant opinions, the undersigned is persuaded that the claimant's functioning is not work preclusive. Therefore, I have concluded that it is not necessary to issuing a decision in this matter to send Dr. Misja an additional form to complete. This decision is consistent with HALLEX I-2-6-60, which provides that the ALJ determines the subject and scope of testimony from a claimant and any witness(es).

(Tr. 18).

Mr. Heatherly contends that by denying his request, the ALJ failed to comply with a

provision of the Hearings, Appeals, and Litigation Law Manual (HALLEX) I-2-7-30, outlining

proffer procedures, and that failure violated his due-process right to a full and fair hearing.

(ECF #8 at PageID 878-80). Mr. Heatherly does not specifically identify what information he

requires from Dr. Misja to satisfy his right to a full and fair hearing. In his argument at the second

hearing, Mr. Heatherly requested the ALJ have Dr. Misja complete the PRTF to place his limitations in terms consistent with the regulations. (Tr. 43).

The HALLEX manual provides "guiding principles, procedural guidance and information to adjudicators and staff of the Office of Hearings and Appeals." *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 397 (6th Cir. 2008). But it is not binding on courts reviewing the SSA's proceedings. *Id.* at 399. Additionally, the HALLEX does not create procedural-due-process rights. *Englehart v. Comm'r of Soc. Sec.*, No. 2:15-cv-2937, 2017 WL 780606, at *5 (S.D. Ohio Mar. 1, 2017) (citation omitted). Consequently, even if Mr. Heatherly established a failure to follow HALLEX procedures, he is not necessarily entitled to relief. *Id.* Nevertheless, some courts have granted relief where a plaintiff can demonstrate sufficient prejudice from that failure. *See Estep v. Astrue,* No. 2:11-0017, 2013 WL 212643, at *12 (M.D. Tenn. Jan. 18, 2013) (collecting cases), *report and recommendation adopted*, 2013 WL 2255852 (May 22, 2013).

Due process requires that a social-security hearing be "full and fair." *Flatford v. Chater,* 93 F.3d 1296, 1305 (6th Cir. 1996) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02 (1971)). "[B]oth the Social Security Act and basic principles of due process require that a claimant receive meaningful notice and opportunity to be heard before his claim for disability benefits can be denied." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 488 (6th Cir. 2006). Section C.1 of HALLEX I-2-7-30 provides that the ALJ will evaluate a claimant's request to question the author of a post-hearing report to determine "whether questioning the author is necessary to inquire fully into the matters at issue," and if so, "whether to conduct the questioning through live testimony or written interrogatories." 1993 WL 643048, at *1 (July 1, 2024). When an ALJ considers post-hearing evidence, as here, the claimant must have the opportunity to review the evidence and an

opportunity to cross-examine the author or to rebut the report. *Watkins v. Sec'y of Health & Human Servs.*, No. 93-1363, 1993 WL 393075, at *1 (6th Cir. 1993). But the right to cross-examine is not absolute. *Flatford*, 93 F.3d at 1305-06. Rather, due process affords a claimant the right to cross-examine where it is "reasonably necessary to the full development of the case." *Id.* at 1307. The ALJ determined it was not necessary to the full development of the case because her analysis of all the evidence of record, including the opinions of the state agency medical consultants, persuaded her that Mr. Heatherly's functional limitations were not work-preclusive. (Tr. 18).

For his part, Mr. Heatherly alleges that failing to obtain further information from Dr. Misja denied him his right to a full and fair hearing but makes no effort to establish prejudice except to conclude "[i]t is clear that the record in this matter established that the ALJ committed harmful error when she denied" his request. Even if Mr. Heatherly could show a violation of HALLEX procedures, he has not established resulting prejudice. Therefore, I recommend the District Court decline to remand on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** for additional proceedings consistent with this recommendation.

Dated: September 12, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

34

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).